# United States Court of Appeals
## For the First Circuit

Nos. 02-1621, 02-1792

UNITED PARCEL SERVICE, INC., and
UNITED PARCEL SERVICE CO.,

Plaintiffs, Appellees/Cross Appellants,

v.

HONORABLE JUAN ANTONIO FLORES-GALARZA,
Secretary of the Department of the Treasury
of the Commonwealth of Puerto Rico, in his official capacity,

Defendant, Appellant/Cross Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Howard, Circuit Judges.

Luis Sanchez Betances, with whom Gerardo De Jesus Annoni and Sanchez-Betances & Sifre, P.S.C. were on brief, for appellants.
Paul T. Friedman, with whom Ruth N. Borenstein, Morrison & Foerster, LLP, Pedro J. Manzano and Fiddler Gonzalez & Rodriguez, LLP, were on brief, for appellees.

February 4, 2003

**HOWARD**, <u>Circuit Judge</u>. The Commonwealth of Puerto Rico has enacted a statutory regime that prohibits an interstate air carrier from delivering any package unless the carrier first provides proof that the package's addressee has paid the appropriate excise tax, or the carrier prepays the amount of the tax on the addressee's behalf. Plaintiffs United Parcel Service, Inc., and United Parcel Service, Co., (collectively "UPS") persuaded the district court to enjoin the Commonwealth's Treasury Secretary from enforcing these delivery restrictions on the grounds of federal preemption. The parties have filed cross-appeals which raise difficult questions about the lawfulness and proper scope of the injunction in light of arguably conflicting federal statutes that, on the one hand, strip the district court of jurisdiction to entertain suits seeking to restrain the collection of any Puerto Rico tax and authorize the Commonwealth to exercise taxing jurisdiction over packages as soon as they enter the island, and, on the other hand, limit the Commonwealth's ability to regulate an air carrier's service. In the end, we affirm the court's central ruling but remand for reconsideration of several peripheral matters.

Before us, Defendant Juan A. Flores-Galarza, in his official capacity as the Secretary of the Department of the Treasury of the Commonwealth of Puerto Rico (the "Secretary"), contends that the district court erred in finding that it had

jurisdiction over the controversy, that Puerto Rico's restrictions on delivery were preempted by federal law, and that an administrative fine imposed by the Secretary was invalid and unenforceable.  The Secretary also makes an alternative argument that the injunction is overbroad.  UPS's cross-appeal challenges the district court's exclusion from the scope of the injunction a statutory provision requiring the payment of license fees by air carriers.

## I.  Factual and Procedural Background

The plaintiffs are corporate affiliates with common controlling ownership engaged in the delivery of packages worldwide.  United Parcel Service Co. is authorized by the Federal Aviation Administration to operate as an air carrier for the transportation of property, and United Parcel Service, Inc. is engaged in the transportation of property by motor vehicle.  UPS offers door-to-door delivery service and the delivery of packages on an express or time-guaranteed basis.  In certain circumstances, UPS refunds delivery charges for express packages that have not been timely delivered. UPS ships approximately 10,000 packages per day to Puerto Rico from the continental United States.  UPS's delivery operations function as an integrated system, requiring extensive planning and coordination among its operating facilities, ground fleet, and air fleet.  Delays and disruptions in operations can affect thousands of packages in transit.

Puerto Rico imposes an excise tax[1] on "articles of use and consumption," including those introduced from elsewhere. 13 P.R. Laws Ann. § 9005. The general tax rate is 5 percent of the taxable price, although the rate varies depending on the article, and there are numerous exemptions. See, e.g., 13 P.R. Laws Ann. § 9015, 9031. No interstate carrier transporting a package subject to an excise levied by the Commonwealth may deliver the package to its intended recipient unless the recipient (the "consignee") presents a certificate from the Department of the Treasury evidencing payment of the requisite tax. 13 P.R. Laws Ann. § 9066 ("§ 9066"). If a carrier delivers a package without obtaining this certificate, the carrier may be required to pay an administrative fine to the Secretary, a tax on the package's contents, and any surcharges and interest accrued from the date the items were introduced into Puerto Rico. See id.; see also 13 P.R. Laws Ann. §§ 8080(a), 8140(6).

As an alternative to the certificate system established by § 9066, carriers such as UPS may prepay the taxes owed, deliver the packages, and seek reimbursement from the packages' consignees. 13 P.R. Laws Ann. § 9077; Article 6.005 of Regulations for the Administration and Enforcement of the Excise Tax of the

_____

[1]An excise tax is "[a] tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or an occupation or activity (such as a license tax or an attorney occupation fee)." Black's Law Dictionary 585 (7th ed. 1999).

Commonwealth of Puerto Rico (the "Articles"). To take advantage of this alternative, carriers must comply with a complex statutory and regulatory scheme resembling the federal customs system. Carriers must provide the Department of the Treasury, on a daily basis, a commercial invoice for each package that describes the package's contents and their cost, as well as a "shipment manifest" that lists packages by specific categories. See 1994 Procedure for Freight Air and Ocean Forwarders Who Are Authorized for the Secretary of the Treasury to Pay Taxes and Take Credit for Articles Returned or Paid In Excess or Improperly ("1994 Procedure") ¶¶ 1-4, 8, 11.

Additionally, carriers who prepay taxes must make packages available for inspection by Treasury agents, and give the agents access to their facilities to supervise the processing of packages. See 1994 Procedure ¶ 10. Carriers must create, maintain, and make available for inspection extensive records relating to the prepayment of fees. See 13 P.R. Laws Ann. §§ 8102, 8140(1); Articles 5.005(7),(11), 6.005. Puerto Rico also requires prepaying carriers to post a bond in excess of the amount required of all carriers under general licensing provisions.[2] 13 P.R. Laws

---

[2]All carriers, even if they do not participate in the prepayment mechanism, must obtain a license from the Secretary to conduct business in the Commonwealth. See 13 P.R. Laws Ann. § 9060. The Secretary retains the discretion to deny, suspend, or revoke such licenses. See 13 P.R. Laws Ann. § 9061; Article 5.005. To obtain a license, carriers must pay a license fee, submit a copy of the income tax return and criminal record of each corporate

Ann. § 9077.  Finally, carriers must calculate and pay the taxes owed by the consignees.  13 P.R. Laws Ann. § 9077; Article 6.005.

Unlike commercial carriers, the United States Postal Service may deliver packages to destinations in Puerto Rico without obtaining certificates from recipients or complying with the prepayment scheme.  Recipients of packages subject to the excise tax must pay the tax directly to the Department of the Treasury within two business days of receiving a package through the U.S. mail.  13 P.R. Laws Ann. § 9068(b)(2).

As described in greater detail in the opinion of the district court, United Parcel Service Inc., v. Flores-Galarza, 210 F. Supp. 2d 33, 38-40 (D.P.R. 2002), UPS has been required to alter significantly the business practices it employs for the rest of the United States to comply with the Commonwealth's prepayment scheme.[3] UPS must, among other things, collect and process comprehensive data on the contents of packages,[4] perform tax ratings on these

officer, and post a bond.  See 13 P.R. Laws Ann. §§ 9059, 9060(a)(1)-(6), 9064; Articles 5.004, 5.008.

[3]If UPS chose not to comply with the Commonwealth's prepayment scheme, delivery would be delayed until a consignee obtained information about the contents of a package, determined the applicable tax, paid the tax to the Secretary, obtained a certificate authorizing delivery, and notified UPS that these steps had been completed.

[4]UPS does not require persons shipping to other parts of the United States to identify the contents of a package or their value. For packages being shipped to Puerto Rico, however, shippers must complete two commercial invoices with this information so that UPS can determine the amount of tax owed.

contents, and delay the delivery of packages until all necessary data have been obtained, or until Treasury agents have had an opportunity to inspect the packages on site. UPS also bears the burden of seeking reimbursement from consignees, pays additional amounts if agents alter assessments on packages after they have been delivered, and maintains a $1.5 million bond. UPS incurs more than $4.6 million per year in costs associated with its compliance with the prepayment scheme.

In 1994, Congress passed the Federal Aviation Administration Authorization Act (the "FAA Authorization Act"), which provided, in relevant part, that no state (defined to include the Commonwealth of Puerto Rico) may "enact or enforce a law, regulation, or other provision having the force and effect of a law related to a price, route, or service of an air carrier . . . when such carrier is transporting property by aircraft or by motor vehicle." 49 U.S.C. § 41713(b)(4)(A). This legislation recodified a preemption provision of the Airline Deregulation Act of 1978, Pub. L. No. 95-504, § 105, 92 Stat. 1708.

In late 1997, the Senate of Puerto Rico passed a resolution directing various Senate committees to investigate the FAA Authorization Act's impact on existing statutes and regulations of Puerto Rico affecting carriers' prices, routes and services. It did so after reaching the preliminary conclusion that the existing scheme might be in conflict with federal law. See S. Res.

917, 13th Leg. Assem., 2d Ord. Sess. (P.R. 1997). Two years later, the Puerto Rico legislature confirmed this conclusion, finding that numerous laws and regulations, including those of the local excise tax system, were impacting or affecting the prices, routes and services of air carriers and affiliated motor carriers. See Act No. 322, 13th Leg. Assem., 6th Ord. Sess. (P.R. 1999) ("Act 322"). In November 1999, the legislature passed Act 322, which would allow air carriers to transport packages to consignees without restriction, and require consignees to pay the excise tax within two business days. Id. Under Act 322, air carriers would provide the Secretary with "the minimum information agreed as necessary in order for the Secretary to proceed to collect the excise taxes, without unreasonably interfering in the ordinary course of business in interstate commerce." Id. This new legislation also exempted air carriers from licensing requirements. Id.

The provisions of Act 322 removing impediments to the delivery of packages would not become effective until June 30, 2001. The legislature concluded that the intervening period would be sufficient for the Department of the Treasury to develop and implement an alternative system consistent with federal law. See id. In the interim, Act 322 provided immediate relief for air carriers by authorizing them to withhold five percent of the taxes they prepaid to the Secretary to defray the costs associated with the existing system. See id.

Act 322's provisions allowing unrestricted delivery were effective for only two business days before the statute was repealed. In July 2001, the Puerto Rico legislature reinstated the § 9066 conditional ban on delivery, as well as the prepayment alternative. During the two business days that Act 322 was effective, UPS delivered packages without collecting excise taxes. UPS provided the Secretary with commercial invoices for each package delivered during those days, which included some, but not all, of the information previously required to be included in daily "shipment manifests."

On the same day that Act 322 was repealed, July 3, 2001, UPS brought suit in the United States District Court for the District of Puerto Rico to enjoin the enforcement of those statutes and regulations affecting its delivery of packages. In its complaint, UPS alleged that Puerto Rico's restrictions on delivery were preempted by the FAA Authorization Act and therefore violated the Supremacy Clause, U.S. Const. art. VI, cl.2.[5] UPS also alleged that the scheme violated the Commerce Clause, U.S. Const. art. I, § 8, cl.3; Equal Protection Clause, U.S. Const. amend. XIV, cl. 1.; and Takings Clause, U.S. Const. amend. V.

---

[5]In particular, UPS sought to enjoin 13 P.R. Law Ann. §§ 8102, 8140, 9060, 9061, 9064, 9066, 9068, 9077; and the 1994 Procedure. It also requested relief from any other statute, regulation or provision having the force and effect of law that fell within the scope of the FAA Authorization Act's preemption provision.

In the weeks immediately following the filing of the complaint, the Secretary directed UPS to turn over shipping manifests for the two-day period in July 2001 when Act 322 was in effect. UPS agreed to do so, but only on the condition that the information would not be used in connection with the pending litigation. The Secretary rejected this offer. On November 26, 2001, the Secretary issued an administrative fine against UPS of $14.24 million, citing UPS's failure to provide certain information allegedly "agreed upon" at a meeting of the parties on June 29, 2001. This amount represented a $1000 fine for each package delivered, based on the Secretary's estimate that approximately 7120 packages were processed each day. UPS made a timely request for reconsideration and an administrative hearing, reserving its right to contest the validity of the fine.

In addition to pursuing its administrative remedies, UPS requested that the district court grant a temporary restraining order or preliminary injunction to prevent the Secretary from enforcing the challenged scheme or the administrative fine. In December 2001, the district court denied this request, concluding that UPS failed to demonstrate that it would suffer irreparable harm if forced to seek relief at the administrative level or that bypassing the administrative process was justified under the circumstances. In reaching its decision, the district court found that the fine arose from a dispute over the information that the

parties "purportedly agreed" would be provided to the Secretary. UPS appealed the district court's decision to this Court.[6]

By March 2002, the Secretary had not responded to a motion for summary judgment filed by UPS in August 2001, prior to the emergence of the administrative fine controversy. The district court ordered the Secretary to file an opposition by March 21, 2002.[7] The Secretary opposed UPS's motion for summary judgment on April 8, 2002, but failed to submit any statement of contested material facts as required by Local Rule 311.12.

In May 2002, the district court issued a series of opinions and orders that, collectively, granted summary judgment in favor of UPS and held that the FAA Authorization Act preempted Puerto Rico's statutory and regulatory scheme affecting the delivery of packages. The district court permanently enjoined the enforcement of all statutory and regulatory provisions challenged by UPS except 13 P.R. Laws Ann. § 9059, a licensing requirement

---

[6]United Parcel Service, Inc. v. Flores-Galarza, No. 01-2767. UPS also asked this Court for injunctive relief pending appeal, or, alternatively, an expedited appeal. We denied these requests, but did so without prejudice to UPS's renewal of its request for injunctive relief pending interlocutory appeal if the district court denied a pending motion seeking the same relief.

[7]The Secretary then moved to stay the proceedings pending UPS's interlocutory appeal, or, alternatively, to enlarge the period for discovery and for responding to the motion for summary judgment. The district court denied this motion, citing the Secretary's failure to comply with Rule 56(f) of the Federal Rules of Civil Procedure, and noting the ample six-month period following the filing of the motion for summary judgment that the Secretary could have utilized to conduct discovery.

referenced in UPS's summary judgment papers but not expressly included within UPS's request for relief.  The district court also invalidated the $14.24 million administrative fine imposed by the Secretary on the ground that it was imposed pursuant to the preempted scheme.  The district court based its decision on the papers filed by the parties, and did not convene a hearing before imposing the injunction.[8]

The Secretary appealed, and UPS cross-appealed solely to the extent the district court excluded the licensing provision, § 9059, from the scope of the permanent injunction.  UPS also obtained a voluntary dismissal of its appeal to this Court on the issue of enforcement of the administrative fine.  See note 6, above.  In July 2002, at the request of the Secretary, this Court granted a stay of the permanent injunction pending resolution of the appeal.[9]

---

[8]The district court had previously scheduled for October 1, 2001 an evidentiary hearing consolidating UPS's requests for preliminary and permanent injunctive relief.  Citing a need to first address a motion to dismiss for lack of subject matter jurisdiction filed by the Secretary, the court cancelled the hearing, but did not reschedule it before reaching a final decision in this case.

[9]The injunction was stayed by a 2-to-1 decision of a panel of this Court.  The majority noted that it could not be certain that the appellant had shown a clear probability of success, but that "the issues are complicated and in our view the equities and the public interest justify maintaining the status quo ante for the additional period necessary to entertain the appeal."  Judge Torruella voted against  staying the permanent injunction, noting that the Secretary had not demonstrated a probability of success, and that UPS, unlike the Secretary, would suffer irreparable harm if the stay was imposed.

## II. Analysis

We replay a familiar refrain. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). We review de novo the district court's grant of summary judgment. See id. In so doing, we construe the record in the light most favorable to the nonmovant, resolving all reasonable inferences in that party's favor. See id. Here, however, the district court, acting within its discretion to manage its cases, accepted the uncontested facts submitted by UPS because of the Secretary's failure to comply with Local Rule 311.12 in its opposition.[10] See A.M. Capen's Co., Inc. v. American Trading and Prod, Corp., 202 F.3d 469, (1st Cir. 2000). Because we confine our review to the record at the time the district court made its ruling on the motion for summary judgment, the facts set forth in UPS's motion for summary judgment are not in dispute. See id. Those

_____

[10]The district court found UPS's statement of facts to be uncontested and therefore admitted pursuant to Local Rule 311.12 of the United States District Court for the District of Puerto Rico. See Corrada Betances v. Sea-Land Service, Inc., 248 F.3d 40, 43 (1st Cir. 2001) ("[N]onmovant's failure to present a statement of disputed facts, embroidered with citations to the record, justifies deeming the facts presented in the movant's statement of undisputed facts admitted"); Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000)("[P]arties ignore [Local Rule 311.12] at their peril"); Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996); Laracuente v. Chase Manhattan Bank, 891 F.2d 17, 19 (1st Cir. 1989); Alvarado-Morales v. Digital Equip. Corp., 843 F.2d 613, 615 (1st Cir. 1988).

facts not included in UPS's statement, specifically those facts relating to the administrative fine imposed after UPS sought summary judgment, are considered in the light most favorable to the Secretary.  See Rochester Ford, 287 F.3d at 38.  We review the district court's grant of injunctive relief "in so far as it involves no question of law" for abuse of discretion.  Conservation Law Found., Inc. v. Busey, 79 F.3d 1250, 1256 (1st Cir. 1996).

## A.        Federal Jurisdiction

As a threshold issue, the Secretary contends that a provision of the Butler Act, codified at 48 U.S.C. § 872,[11] deprived the district court of jurisdiction over the action filed by UPS. Under the Butler Act, "[n]o suit for the purpose of restraining the assessment or collection of a tax imposed by the laws of Puerto Rico shall be maintained in the United States District Court for the District of Puerto Rico."  48 U.S.C. § 872.  For the reasons that follow, the prohibition does not apply to this case.

The Secretary contends that UPS has challenged the statutory and regulatory mechanism for collecting the excise tax, thus UPS seeks to restrain the assessment or collection of the tax

---

[11]This provision of the Butler Act is analogous to the Tax Injunction Act, 28 U.S.C. § 1341, which limits the jurisdiction of federal district courts to entertain suits to enjoin the levying or collection of a state tax.  The two statutes employ different language (i.e. the Tax Injunction Act includes an express exception that the Butler Act lacks), but "have been construed in pari materia."  Trailer Marine Transp. Corp. v. Rivera-Vazquez, 977 F.2d 1, 5 (1st Cir. 1992) (citing Parker v. Agosto-Alicea, 878 F.2d 557, 558-59 (1st Cir. 1989)).

within the meaning of the Butler Act.  But the action initiated by UPS sought to enjoin only those provisions of the laws and regulations of Puerto Rico that prohibit or interfere with the delivery of packages.  UPS did not challenge the amount or validity of the excise tax, nor the authority of the Secretary to assess or collect it.  The relief sought by UPS leaves the Secretary free to collect the tax from those who owe it.

Not every statutory or regulatory obligation that may aid the Secretary's ability to collect a tax is immune from attack in federal court by virtue of the Butler Act's jurisdictional bar. See Wells v. Malloy, 510 F.2d 74, 76-77 (2d Cir. 1975)(Friendly, J.)(action questioning the constitutionality of a statute providing for suspension of a driver's license for failure to pay motor vehicle taxes did not constitute an attempt to restrain the assessment or levy of the tax); see also Mobil Oil Corp. v. Tully, 639 F.2d 912, 918 (2d Cir. 1981)(holding that the "mere fact that the [challenged provision] is contained in a tax law of the State should not lead to automatic sanctuary" under the Tax Injunction Act).  Such an interpretation extends the concept of tax collection, and therefore the breadth of the Butler Act, too far. See Wells, 510 F.2d at 77 (rejecting as overbroad an interpretation of tax collection that would include "anything that a state has determined to be a likely method of securing payment").

Like the Tax Injunction Act, the Butler Act's jurisdictional bar extends to

> cases where taxpayers were repeatedly using the federal courts to raise questions of state or federal law going to the validity of the particular taxes imposed upon them -- not to a case where a taxpayer contended that an unusual sanction for non-payment of a tax admittedly due violated his constitutional rights, an issue which, once determined, would be determined for him and all others.

Id. (notation omitted). Admittedly, the conditional ban on package deliveries may not seem to be in some respects as unusual as the drivers' license penalty in Wells. Nevertheless, because the delivery ban targets third parties instead of those who owe the tax, this is not a prototypical Tax Injunction Act or Butler Act case. UPS does not seek to restrain a system that "produce[s] money or other property directly." Id. Instead, by exposing commercial carriers to fines and penalties (including the loss of their license to do business in Puerto Rico) if they choose to deliver a package without collecting a certificate from the recipient, § 9066 produces tax money "indirectly through a more general use of coercive power," id., using the threat of sanctions against private parties who do not even owe the taxes at issue.[12]

---

[12]In this respect, the case before us is distinguishable from cases cited by the Secretary challenging payroll withholding as a mechanism of tax collection. See United States v. American Friends Society Comm., 419 U.S. 7 (1974); Sipe v. Amerada Hess Corp., 689 F.2d 396 (3d Cir. 1982). These challenges, which fell outside the jurisdiction of the district courts under the Anti-Injunction Act, 26 U.S.C. § 7421(a) and the Tax Injunction Act, 28 U.S.C. § 1341, respectively, attacked a method of tax collection. Section 9066 is a conditional ban on package deliveries, not a method of tax collection.

This is not a system of tax collection within the meaning of the Butler Act.

The fact that commercial carriers have the option -- a perhaps generous characterization -- to participate in the alternative prepayment system does not alter the equation. The prepayment alternative would have no teeth independent of the § 9066 ban on service. It may thus be the case that, for all practical purposes, commercial carriers have been conscripted into making payments on behalf of taxpayers, thereby promoting the Secretary's revenue raising efficiency as a condition of doing business. But we should not deny a federal forum to a party challenging the constitutionality of this system on the ground that an adverse ruling could make the Secretary's job harder.[13]

**B.        Preemption under the FAA Authorization Act**

Urging that Puerto Rico's restrictions on delivery are not preempted by the FAA Authorization Act, the Secretary advances two principal arguments. First, the Secretary notes that Puerto Rico has a special taxing power under Section 3 of the Federal Relations Act, 48 U.S.C. § 741a. According to the Secretary, the

---

[13]Our decision in United States Brewers Association, Inc. v. Perez, 592 F.2d 1212 (1st Cir. 1979) is not to the contrary. There, the plaintiffs challenged the Commonwealth's tax on beer produced by large manufacturers, seeking either to restrain the imposition of the tax, or to require the Commonwealth to impose the tax on all manufacturers. See id. at 1215. That case, unlike the case now before us, directly attacked the Commonwealth's taxing authority. See id.

FAA Authorization Act cannot be read to limit this unique taxing authority by preempting statutes and regulations that merely implement it. Second, the Secretary contends that Congress did not intend to preempt the challenged statutes and regulations, which either fall outside the scope of the FAA Authorization Act's preemptive effect or are preserved under other provisions of federal law. Although ably pressed, both of these arguments ultimately come up short.

**1. The Role of the Federal Relations Act**

Section 3 of the Federal Relations Act provides in part that any excise tax imposed by Puerto Rico "may be levied and collected . . . as soon as the [taxable items] are manufactured, sold, used, or brought into the island." 48 U.S.C. § 741a. The Secretary says that the parcel delivery requirements merely implement Puerto Rico's taxing authority under the Federal Relations Act. So, he argues, "this case does not involve a state statute that is subject to preemption by a federal statute," but instead involves only the interface between two federal statutes, the FAA Authorization Act and the Federal Relations Act. The case would thus turn on whether the FAA Authorization Act impliedly repealed the Federal Relations Act. The Secretary says it did not.

Pointing to Congress's 1927 addition of the language that the excise tax may be levied "as soon as" taxable goods are brought into Puerto Rico, and that U.S. Customs and Postal Service

officials "are directed to assist the appropriate officials of the Puerto Rican government in the collection of these taxes,"[14] 48 U.S.C. § 741a, the Secretary contends that Puerto Rico has specific Congressional authorization to restrict the delivery of packages as necessary to collect the excise tax.

Taken alone, Section 3 would seem to strengthen the Secretary's hand in challenges to the tax and perhaps even its "no delivery" feature, at least as to those challenges based on the Commerce Clause. In practice, Puerto Rico has wielded a unique power as a result of the Federal Relations Act. In the years following the 1927 amendment, Puerto Rico succeeded in imposing a state tax on oil imported into bonded warehouses where New York failed -- the critical distinction between the two taxes being the specific taxing authority of Puerto Rico under the Federal Relations Act. Compare West India Oil Co. v. Domenech, 311 U.S. 20, 25-27 (1940)(permitting Puerto Rico to impose tax on fuel oil imported into bonded warehouses because of Puerto Rico's taxing authority under 48 U.S.C. § 741a), with McGoldrick v. Gulf Oil Corp., 309 U.S. 414, (1940) (invalidating a New York sales tax imposed on crude oil imported into warehouses under bond because of its conflict with federal statutes occupying the field). The West India Court allowed Puerto Rico to impose the tax, despite federal

_____

[14]Section 3 of the Federal Relations Act was amended by the Butler Act of 1927, ch. 503, 44 Stat. 1418, the same legislation that imposed the federal jurisdictional limitation on tax suits discussed in Section II.A., above.

statutes enacted after the Federal Relations Act and its 1927 amendment indicating Congress's intent to regulate bonded warehouses. See West India, 311 U.S. at 29 ("[C]onsidering the relationship of general Congressional legislation to legislation specifically applicable to our territories, and possessions, repeals by implication are not to be favored and will not be adjudged unless the legislative intention to repeal is clear.").

Despite Section 3 of the Federal Relations Act's reach, there does not appear to be any evidence that Congress focused at all on the delivery bar issue, much less intended a specific endorsement of a scheme in which carriers were to be barred from making deliveries until they produced certificates that as a practical matter could not be done on a widespread basis. Congress intended that the 1927 amendment to the Federal Relations Act resolve existing controversy over whether taxes could be imposed on goods still in their original packaging.[15] See H.R. Rep. No. 1370, at 2 (1926); S. Rep. No. 1011, at 2 (1926) Previously, courts had held that U.S. Customs and Postal Service officials could not withhold delivery of incoming articles, "as such tax collected in

_____

[15]At the time of the amendment, the "original package" distinction was significant: Existing Supreme Court precedent held that state taxes on goods that were "imports" and not yet "incorporated into the mass of property in the State" (such as goods in their original packages) were invalid under the Import-Export Clause, U.S. Const. art. I, § 10, cl. 2. See Low v. Austin, 80 U.S. (13 Wall.) 29 (1871); see also United States v. International Bus. Mach. Corp., 517 U.S. 843 (1996)(chronicling the rise and fall of the "original package" doctrine).

-20-

this manner is in effect a customs duty."  Id.  Puerto Rico was thus hindered in its efforts to levy the tax, and Congress amended Section 3 of the Federal Relations Act "[f]or the purpose of righting this situation."  Id.  The change gave express authority to federal officials to aid in the collection of the tax, and clarified that incoming articles were subject to Puerto Rico's taxing jurisdiction "as soon as" they entered the island (whether arriving from the United States mainland or from foreign countries).  It neutralized "the regulatory effect of the customs laws and regulations in so far as they protected articles from local taxation after their arrival."  West India, 311 U.S. at 28.

Just as Congress did not have in mind the authority claimed by Puerto Rico in this case, neither is there evidence that Congress had this scheme in mind when it enacted the FAA Authorization Act.  We are left with two different federal statutes (the Federal Relations Act and the FAA Authorization Act), neither of which specifically address the issues raised in this case.  As to these issues, therefore, neither statute has any automatic priority over the other.

In our view, the Federal Relations Act and the FAA Authorization Act can co-exist harmoniously.  Our analysis proceeds down a well worn path: where two federal statutes are alleged to be in conflict, we look to whether they touch upon the same subject, and if so, whether we can give effect to both statutes.  See Rhode

Island v. Narragansett Indian Tribe, 19 F.3d 685, 703 (1st Cir. 1994). We are further guided by the familiar principle of construction that implied repeals are disfavored. Id. Here, the statutes at issue address two very different subjects: Puerto Rico's taxing authority on the one hand and deregulation of the air transportation industry on the other.

The Federal Relations Act does not suggest that Puerto Rico is empowered to impose restrictions on the delivery of packages by private carriers. The legislative history describing the purpose of the 1927 amendment includes the observation that Congress expected that the government of Puerto Rico would "make use of this power so as not to unnecessarily place any barriers in the way of the free-trade conditions now existing" between Puerto Rico and the mainland United States, "which is [a] principal factor in the progress and prosperity of P[ue]rto Rico." H.R. Rep. No. 1370, at 2 (1926); S. Rep. No. 1011, at 2 (1926). We do not interpret the statute as conferring a broad authority to regulate the flow of packages in interstate commerce that conflicts with the FAA Authorization Act. To do so would be to manufacture a statutory conflict where none exists.

As a practical matter, it is not the case that the Secretary's exercise of his taxing authority necessitates the regulation of packages entering Puerto Rico. Packages arriving by U.S. mail are delivered without interference, and recipients are

-22-

required to pay any applicable tax within 48 hours.  See 13 P.R. Laws Ann. § 9068.  The Secretary has introduced no evidence suggesting why this approach (or some other legislatively established process) would not be suitable for packages arriving by air carrier.  Nor has he put forth a rational explanation for treating these two forms of delivery so differently.[16]

### 2.          Legislative Intent to Preempt

The Secretary's second major argument is that Congress did not intend to preempt the challenged scheme, which either falls outside the scope of the preemption clause of the FAA Authorization Act, or is preserved under other provisions of federal law.  So, the reasoning goes, the district court construed too broadly the scope of the FAA Authorization Act's express preemption provision, which provides that no state may

> [E]nact or enforce a law, regulation, or other provision having the force and effect of a law <u>related to a price, route, or service of an air carrier</u> . . . when such carrier is transporting property by aircraft or by motor vehicle.

49 U.S.C. § 41713 (emphasis added).  In determining the scope of this provision, we look to Congress's intent, which is revealed in

---

[16]Instead of addressing whether packages delivered by air carriers ought to be treated in the same manner as those delivered by the U.S. mail, the Secretary appears to contend that he lacks authority to impose comparable regulations on the U.S. postal system, which is within the "exclusive domain of Congress." Whether or not this is true, the plain language of Section 3 of the Federal Relations Act instructs federal postal employees to aid local officers in the collection of the tax.  48 U.S.C. § 741a.

the language of the provision, as well as the structure and purpose of the statute.  See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992)(interpreting the statutory predecessor to § 41713).[17]  Setting aside those portions of the statute that indisputably apply to the facts of the current case,[18] the crux of the matter is whether the laws at issue are "related to a price, route, or service" of UPS.

The phrase "related to" has a broad meaning in ordinary usage: "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association or connection with." Id. (quoting Black's Law Dictionary 1158 (5th ed. 1979)).  When used in

---

[17]The language of the preemption provision considered by the Morales Court varied slightly from the language of 49 U.S.C. § 41713.  There is reason to think the intervening amendments did not narrow the provision's broad preemptive effect:

In substituting the word "related" for the prior word "relating" and the word "price" for the word "rates" we are intending no substantive change to the previously enacted preemption provision in Section 105 of the Federal Aviation Act and do not intend to impair the applicability of prior judicial case law interpreting these provisions. In particular, the conferees do not intend to alter the broad preemption interpretation adopted by the United States Supreme Court in Morales v. TransWorld Airlines, Inc., 504 U.S. [374], 199 L.Ed. 157, 112 S.Ct 2031 (1992).

H.R. Rep. No. 103-240, at 83 (1994), reprinted in 1994 U.S.C.C.A.N. 1676, 1755.


[18]The statute applies to Puerto Rico, which is included within the definition of "state."  Further, the Secretary does not deny that the challenged restrictions are "law[s]" and "regulation[s]," nor that UPS is an "air carrier" within the meaning of the statute.

a preemption provision such as § 41713, it has a similarly broad reach. State laws and regulations "having a connection with or reference to" an air carrier's prices, routes or services are preempted under § 41713. See id. at 384. A sufficient nexus exists if the law expressly references the air carrier's prices, routes or services, or has a "forbidden significant effect" upon the same. Id. at 388. This interpretation is consistent with the purpose animating the FAA Authorization Act and Airline Deregulation Act, which sought to prevent states from interfering with the goal of federal deregulation of air transportation by imposing regulations of their own. See id. at 378.

In his attempt to circumscribe the breadth of this interpretation, the Secretary suggests that only statutes and regulations that "seek to set, control or manipulate" an air carrier's prices, routes, or services are preempted by the FAA Authorization Act. This narrower interpretation would read the "related to" language out of the statute, an approach expressly rejected by the Supreme Court.[19] See id. at 385 ("Had the statute

---

[19]The Secretary argues that the broad preemption standard adopted in Morales has been overruled by a number of Supreme Court cases narrowing the preemptive effect of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a). See, e.g. De Buono v. NYSA-ILA Medical and Clinical Services Fund, 520 U.S. 806 (1997); California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc., 519 U.S. 316 (1997); New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645 (1995). While the Morales Court undoubtedly took its interpretive cues from the ERISA preemption jurisprudence then in existence, it does not follow that any change in ERISA law necessitates a parallel change in the law

been designed to pre-empt state law in such a limited fashion, it would have forbidden the states to 'regulate rates, routes and services.'").

The challenged scheme both refers to and has a forbidden significant effect on UPS's prices, routes or services. Section 9066 -- the linchpin of the scheme -- forbids delivery unless and until a recipient produces a certificate from the Secretary. Compliance with this provision significantly affects the timeliness and effectiveness of UPS's service, which includes the delivery of packages on an express or time-guaranteed basis. Likewise, the prepayment mechanism imposes extensive requirements that must be met before a carrier may make a lawful delivery. These requirements create a substantial burden on UPS, in the form of additional labor, costs, and delays. The undisputed record, as chronicled by the district court below, shows that this burden directly and significantly affects UPS's routes and services, which depend upon an orderly flow of packages. United Parcel Service, 210 F. Supp. 2d at 38-40. The costs of this scheme necessarily have a negative effect on UPS's prices. See Federal Express Corp. v. California Pub. Util. Comm'n, 936 F.2d 1075, 1078 (9th Cir. 1991) ("Terms of service determine cost. To regulate them is to

affecting air carriers. As Judge Easterbrook has put it: "[I]f developments in pension law have undercut holdings in air-transportation law, it is for the Supreme Court itself to make the adjustment. Our marching orders are clear: follow decisions until the Supreme Court overrules them." United Airlines, Inc. v. Mesa Airlines, Inc., 219 F.3d 605, 608 (7th Cir. 2000).

affect the price."). In view of the uncontroverted record, we must conclude that the challenged scheme falls within the scope of the FAA Authorization Act's preemption provision.

Against the weight of this authority, the Secretary argues for a presumption against preemption. This presumption only arises, however, if Congress legislates in a field traditionally occupied by the states. United States v. Locke, 529 U.S. 89, 108 (2000) (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). The Secretary does not dispute that there has been a longstanding federal presence in the field of air transportation. Instead, he says that the relevant field is "state taxation." We think our earlier analysis of the Butler Act puts to rest the question of whether our task is to determine the validity of a Commonwealth tax. On the contrary, our task is to determine the preemptive effect of the FAA Authorization Act within the field of air transportation. No presumption against preemption is appropriate in this case because of Congress's significant -- and undisputed -- presence in the field of air transportation.[20]

In the face of the "specific substantive pre-emption provision" of the FAA Authorization Act, Morales, 504 U.S. at 385, the Secretary also asks us to conclude that the challenged scheme

---

[20]The Secretary likewise urges us to conclude that preemption should not occur here, because, in adopting and enforcing the scheme, Puerto Rico is merely acting within a "sphere of authority" under a "dual system of federal and state regulation." Again, the Secretary insists that the relevant field is "taxation," which we reject for the reasons discussed above.

survives by virtue of other provisions of federal law or the FAA Authorization Act's legislative history. First, he points to 26 U.S.C. § 7653, a provision of the Internal Revenue Code that subjects articles manufactured in the mainland United States to a tax at the port of entry in Puerto Rico that is equal to (in rate and amount) the tax imposed upon articles manufactured in Puerto Rico. Like Section 3 of the Federal Relations Act, this provision prevents discriminatory taxation in favor of merchandise produced in Puerto Rico. Cf. 26 U.S.C. § 7652(a)(1) (subjecting articles of Puerto Rican manufacture entering the mainland United States to "a tax equal to the internal revenue tax imposed in the United States upon the like articles of domestic manufacture"). It is not a blanket authorization for Puerto Rico to regulate the delivery of goods. Indeed, Puerto Rico allows the unrestricted delivery of taxable merchandise through the U.S. mail.

The Secretary also looks to the FAA Authorization Act's legislative history for support for his position, in particular a statement that "nothing in this amendment is intended to change the application of State tax laws to motor carriers." H.R. Conf. Rep. No. 103-677 at 85 (1994), reprinted in 1994 U.S.C.C.A.N. 1676, 1757. Even if we were bound by this fragment of the legislative history, the Secretary's interpretation of it is not consistent with its plain language, or with the overall purpose of the legislation. The taxes at issue in the case before us are

generally applicable excise taxes, not taxes on motor carriers. Moreover, the regulatory authority retained by the states was not "to be used as a guise for continued economic regulation as it relates to prices, routes or services." H.R. Conf. Rep. No. 103-677 at 84 (1994), reprinted in 1994 U.S.C.C.A.N. 1676, 1756.

Finally, the Secretary contends that the challenged scheme survives under the Federal Anti-Head Tax Act, 49 U.S.C. § 40116(e) (formerly 49 U.S.C. § 1513(b)), a provision that he characterizes as a "savings clause." This statute prohibits the states from imposing a tax or "head charge" on air transportation, including taxes on air passengers and gross receipts from air transportation. See id. § 40116(b). The provision on which the Secretary relies, § 40116(e), preserves the right of the states to collect those taxes not otherwise barred by the statute. Far from a clear manifestation of congressional intent to permit Puerto Rico's ban on delivery, this broad provision merely preserves certain rights of taxation already held by the states. It creates no new rights for Puerto Rico, and adds nothing to the analysis where, as here, the right of Puerto Rico to levy and collect the excise tax is undisputed.[21]

---

[21]Although we address the merits of the Secretary's arguments regarding these federal provisions (i.e. portions of the Internal Revenue Code, the legislative history of the FAA Authorization Act, or the Anti-Head Tax Act), we note that the Secretary raises these issues for the first time on appeal. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999)("[A]bsent exceptional circumstances, not present here -- we consider on appeal only arguments that were before the nisi prius court").

## C.        The Scope of the Injunction

Beyond the issue of whether injunctive relief is proper in this case -- a question we answer in the affirmative -- lies the issue of whether the particular relief granted was appropriate.  A district court has broad discretion to fashion an appropriate equitable remedy, but the relief imposed should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Califano v. Yamasaki, 442 U.S. 682 (1979); Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 40 (1st Cir. 2002).  Both the Secretary and UPS (in its cross-appeal) challenge the scope of the injunction, alleging that it goes too far or not far enough depending on the point of view.[22]

While several of the parties' submissions touched on matters relevant to the remedy question, the scope issues discussed below were not fully briefed by the parties in anticipation of the

---

[22]In particular, the Secretary contends that the injunction should not extend to 13 P.R. Laws Ann. §§ 8102, 9060, 9061, 9064, or any provision affecting the "motor vehicles" or "household goods" exceptions to 49 U.S.C. § 41713(b)(4)(B)(i)-(ii).  UPS contends that the injunction should have precluded enforcement of a licensing provision, 13 P.R. Laws Ann. § 9059, a proposition disputed by the Secretary on appeal.  The Secretary also challenges the district court's invalidation of the $14.24 million administrative fine through the injunction, an issue we treat as distinct from the question of which statutes and regulations ought to be enjoined and address separately below.

injunction.[23]  In view of the public policy implications of this case, we conclude that the parties should be afforded an additional opportunity to present the court with their positions as to the nature and scope of the remedy.  We therefore affirm in principle part but remand on three selected issues for further proceedings consistent with this opinion.

The issues to be addressed on remand should be limited to those pertaining to the scope of the district court's injunction that the parties have briefed and argued on appeal.  Of these, the one that seems closest is whether the court is now empowered to, and should, invalidate the $14.24 million administrative fine imposed by the Secretary during the course of this litigation.  As previously noted, the court enjoined the Secretary from enforcing the fine because it thought the sanction had been imposed pursuant to the preempted legal regime.  On appeal, the Secretary says that the court did not appreciate that the fine was imposed under the short-lived Act No. 322 (and not the preempted regime), and that, because UPS has not yet exhausted its state remedies with respect to the fine, the court should have abstained under Younger v. Harris, 401 U.S. 37 (1971), and related comity-based doctrines. UPS responds that the fine was indeed imposed (for retaliatory reasons) pursuant to the preempted regime, and that the Secretary's

_____

[23]Perhaps this was because the district court, in cancelling the October 1, 2001 hearing, used language suggesting that there would be an opportunity for further argument and record development in connection with any injunction it might enter.

-31-

other arguments are therefore beside the point. Because a substantial amount of money is at stake and more comprehensive briefing and record development may be helpful, prudence dictates that the district court be afforded an opportunity to revisit the matter after hearing from the parties.

The second issue open to revisiting on remand is whether the statutory savings clauses that allow states to regulate motor vehicle safety and the transportation of household goods, 49 U.S.C. § 41713(b)(4)(B)(i)-(ii), should limit the scope of the injunction. It is not clear that the Secretary presented any argument below on the basis of these clauses and, to the extent they are relied upon as grounds for a claim that no injunction should issue, the claim is forfeited. See Higgins, 194 F.3d at 259. This would not necessarily be true so far as the clauses are relied upon for purposes of arguing for a narrower injunction; but we are at a loss to understand how either clause might curtail the relief sought by UPS, and the Secretary's brief is not very enlightening on this point. If the Secretary has some serious argument as to how the injunction needs minor modifications on account of these clauses, we do not foreclose him from presenting such an argument on remand. But it is not yet apparent that the Secretary has such an argument.

Finally, the district court originally described as preempted and then reinstated 13 P.R. Laws Ann. § 9059, which imposes a licensing fee of $2000 per year on air carriers. UPS has

cross-appealed, citing authorities suggesting that other courts have found similar licensing fees to be preempted by the FAA Authorization Act.  The issue is not directly addressed by the district court and, in view of the remand on other issues, we think it would be useful to have the district court's explanation of its position clarified before the matter is reviewed.  We thus leave the district court free in the first instance to affirm or modify the injunction, with respect to § 9059, as it finds appropriate.

### III.  Conclusion

For the reasons stated above, we **affirm** the district court's amended judgment but **remand** as to the three issues identified above, as to which our affirmance is provisional, and we retain jurisdiction for any further appellate proceedings that may be required.  <u>Central Maine Power Co.</u> v. <u>FERC</u>, 252 F.3d 34, 48 (1st Cir. 2001).

The district court is directed to address and resolve the three remaining issues within 120 days of the date of this decision and is at liberty to modify the injunction as may be required by the resolution of those issues, any such resolution being reviewable by a timely filed new appeal or appeals in accordance with usual practice.  A copy of the district court's new decision shall be filed with the clerk of this court and transmitted to this panel.

The stay of the injunction pending appeal previously issued by this court is vacated forthwith.  Further, the mandate of this court shall issue forthwith.  <u>In re Grand Jury Proceedings</u>, 183 F.3d 71, 79 (1st Cir. 1999).  This does not affect the right of any party to petition for rehearing or rehearing en banc.

**<u>It is so ordered</u>**.

-34-