Anna L. WARD a/k/a Big Indian Smoke Shop, and Barry Snyder, Jr. a/k/a Jr's Smoke Shop, Plaintiffs,

v.

The State of NEW YORK, Eliot Spitzer, in his Official Capacity as Attorney General of the State of New York, Antonia C. Novello, M.D., in her Official Capacity as Commissioner of Health for the State of New York, and Arthur J. Roth, in his Official Capacity as Commissioner of Taxation and Finance of the State of New York, Defendants.

No. 03–CV–485S.

United States District Court, W.D. New York.

Aug. 19, 2003.

See also 320 F.3d 200.

Paul Cambria, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Buffalo, NY, for Plaintiffs.

Stephen F. Gawlik, Assistant Attorney General, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

SKRETNY, District Judge.

## I. INTRODUCTION

One of federalism's fundamental principles is that the States are primarily responsible for protecting the health, safety, and welfare of their citizens. As such, the State of New York has a legitimate and substantial interest in enacting laws and regulations pursuant to its historic police power. On the other hand, Indian tribes have a unique sovereign status, recognized by the Supreme Court and deeply rooted in traditions of tribal independence, which insulates them from state regulation in some respects. This case involves a collision of these competing concerns.

Currently before this Court is Plaintiffs' Motion for a Temporary Restraining Order. Plaintiffs, two enrolled members of the Seneca Indian Nation, challenge the constitutionality of § 1399–*ll* of the New York Public Health Law ("the Statute"), which bans the direct shipment and transportation of cigarettes to New York consumers. Plaintiffs contend that the Statute violates certain rights secured to Indians under the Constitution. In addition, they assert that the Statute is preempted by federal legislation governing the regulation of common and contract carriers. For the reasons set forth

below, Plaintiffs' Motion will be granted in part and denied in part.

## II. BACKGROUND

### A. The Statute

New York Governor George E. Pataki signed the Statute into law on August 16, 2000.[1] Subdivision One of the Statute makes it unlawful to ship cigarettes directly to New York consumers. *See* N.Y. PUB. HEALTH LAW § 1399–*ll* (1).[2] Subdivision Two prohibits the knowing transportation of cigarettes to New York consumers. *See* N.Y. PUB. HEALTH LAW § 1399–*ll* (2).[3] However, Subdivision Two contains a limited "home delivery" exception, which allows a person other than a common or contract carrier to transport eight hundred cigarettes or less at any one time to any person in the state. N.Y. PUB. HEALTH LAW § 1399–*ll* (2). Violation of either subdivision is a class A misdemeanor for a first-time offender and a class E felony for subsequent violations. N.Y. PUB. HEALTH LAW § 1399–*ll* (5). In addition, the Stat-ute authorizes the imposition of civil fines for violations of either subdivision. N.Y. PUB. HEALTH LAW § 1399–*ll* (5).

Shortly after the Statute became law, a group of tobacco manufacturers and retailers filed lawsuits in the United States District Court for the Southern District of New York challenging its constitutionality. These suits were later consolidated into a single action. The plaintiffs in that action argued that the Statute unconstitutionally restrained and discriminated against interstate commerce. On November 13, 2000, the district court issued a Temporary Restraining Order prohibiting the State from enforcing the Statute. On June 8, 2001, the district court issued a Decision and Order declaring that the Statute violated the Interstate Commerce Clause and permanently enjoining its enforcement. *Santa Fe Natural Tobacco Co., Inc. v. Spitzer*, No. 00–CIV–7274 (LAP), 00–CIV–7750 (LAP), 2001 WL 636441 (S.D.N.Y. June 8, 2001).

---

**1.** A detailed discussion of the Statute's legislative history may be found in *Santa Fe Natural Tobacco Co., Inc. v. Spitzer*, No. 00–CIV–7274 (LAP), 00–CIV–7750 (LAP), 2001 WL 636441, at *1–*9 (S.D.N.Y. June 8, 2001).

**2.** The text of Subdivision One reads as follows:

It shall be unlawful for any person engaged in the business of selling cigarettes to ship or cause to be shipped any cigarettes to any person in this state who is not: (a) a person licensed as a cigarette tax agent or wholesale dealer ...; (b) an export warehouse proprietor ... or an operator of a customs bonded warehouse ...; or (c) a person who is an officer, employee or agent of the United States government, this state or a department, agency, instrumentality or political subdivision of the United States or this state, when such person is acting in accordance with his or her official duties .... N.Y. PUB. HEALTH LAW § 1399–*ll* (1).

**3.** Subdivision Two provides that:

It shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than a person described in paragraph (a), (b) or (c) of subdivision one of this section. For purposes of the preceding sentence, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in paragraph (a), (b) or (c) of subdivision one of this section. It shall be unlawful for any other person to knowingly transport cigarettes to any person in this state, other than to a person described in paragraph (a), (b) or (c) of subdivision one of this section. Nothing in this subdivision shall be construed to prohibit a person other than a common or contract carrier from transporting not more than eight hundred cigarettes at any one time to any person in this state. N.Y. PUB. HEALTH LAW § 1399–*ll* (2).

On February 13, 2003, the United States Court of Appeals for the Second Circuit issued a decision reversing the district court. *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003). The appeals court found that the Statute did not violate the Interstate Commerce Clause and remanded the case with instructions to enter judgment in favor of the State. *Id.* at 219. On May 2, 2003, the district court vacated its prior order and granted judgment in favor of the State. Shortly thereafter, the State publicly declared its intention to begin enforcing the Statute.[4]

## B. Background of this Litigation

Plaintiffs commenced the instant action on June 20, 2003, by filing a Summons and Complaint in New York State Supreme Court, Erie County. On June 24, 2003, Defendants removed the case to the United States District Court for the Western District of New York. Plaintiffs filed an Amended Complaint on August 4, 2003.

Plaintiffs Anna L. Ward and Barry Snyder, Jr. are enrolled members of the Seneca Indian Nation. (Amended Complaint, ¶¶ 7, 9). They operate businesses on the Cattaraugus Indian Reservation, located near Irving, New York. *Id.* at ¶¶ 8, 10. As part of their business, Plaintiffs sell cigarettes via the telephone, mail order, and the Internet to customers living inside and outside of New York. *Id.* In addition, Plaintiffs sell cigarettes at "brick and mortar" retail stores located on the reservation. *Id.*

Defendant Eliot Spitzer is the Attorney General of the State of New York. Defendant Antonia C. Novello is the New York State Commissioner of Health. Defendant Arthur J. Roth is the Commissioner of Taxation and Finance of the State of New York. These defendants are responsible for enforcing the Statute and are sued in their official capacities. Plaintiffs' Amended Complaint also names the State of New York as a defendant. The defendants will be referred to collectively herein as "Defendants" or the "State."

On July 2, 2003, Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction.[5] This Court heard oral argument on July 17, 2003 and August 5, 2003. At the conclusion of oral argument, this Court deemed the matter submitted and reserved decision.

## III. DISCUSSION

Plaintiffs' claims can be divided into two broad categories. First, they assert that the Statute infringes upon special rights secured to Indians under the Constitution. For the sake of convenience, this category

---

**4.** In addition to the *Brown & Williamson* case, at least two other actions have been filed challenging the Statute. On April 17, 2003, a group of on-line tobacco retailers and two disabled New York consumers filed an action in the United States District Court for the Western District of New York. That action remains pending before this Court. *See Oltra, Inc. v. Pataki*, 273 F.Supp.2d 265 (W.D.N.Y. 2003).

During that same month, a group of carriers filed a lawsuit in the Southern District of New York seeking declaratory and injunctive relief against Subdivision Two of the Statute (the section banning direct transportation of cigarettes). *See New York State Motor Truck Ass'n v. Pataki*, No. 03–CIV–2386 (GBD) (S.D.N.Y.). As far as this Court can determine, that case remains pending in the Southern District.

**5.** In support of their motion, Plaintiffs filed a memorandum of law, a reply memorandum of law, Affidavit of Barry Snyder, Jr., Affidavit of Anna L. Ward, Reply Affidavit of Anna L. Ward, and Affidavit of Paul Cambria, Jr., Esq. In opposition, Defendants filed a memorandum of law, Affidavit of Richard Sevenson, and Declaration of Thomas Stanton. In addition, the parties filed supplemental memoranda of law at the direction of this Court.

of claims will be referred to as the "Indian rights claims." Second, Plaintiffs contend that the Statute is preempted by the Federal Aviation Administration Authorization Act of 1994 (the "FAAAA").

## A. TRO Standard

■ Generally, a party seeking injunctive relief "must show (1) 'a threat of irreparable injury and (2) either a probability of success on the merits or sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir.2003) (emphasis added) (quoting *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir.1997)).

■ However, when the moving party seeks to enjoin government action taken in the public interest pursuant to a statutory scheme, that party must satisfy the more rigorous "likelihood of success on the merits" standard and may not resort to the lower "fair ground of litigation" test. *See Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999). "[T]his exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995).

■ In the present case, because Plaintiffs seek to prevent the State from enforcing a duly enacted law, they must demonstrate both a threat of irreparable injury and a likelihood of success on the merits. This Court finds that Plaintiffs have established the first element. Generally, irreparable injury is presumed where, as here, there is an alleged violation of constitutional rights. *See Jolly v. Cough-*

*lin*, 76 F.3d 468, 482 (2d Cir.1996) (finding that district court "properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights"). In addition, Plaintiffs submitted affidavits alleging that enforcement of the Statute will cause them to lose substantial revenue and customer goodwill. (Snyder Affidavit, ¶¶ 23, 24; Ward Affidavit, ¶¶ 26, 27). These damages are non-compensable because the Eleventh Amendment bars Plaintiffs from recovering money damages as against Defendants. Therefore, this Court's analysis will focus on whether Plaintiffs have established the second element—likelihood of success on the merits.

## B. Indian Rights Claims

Plaintiffs contend that the Statute infringes upon their Indian rights by regulating Indian commerce in violation of the Indian Commerce Clause and by interfering with tribal sovereignty. Before addressing the merits of these claims, this Court must first decide whether Plaintiffs can challenge the Statute on its face or whether they are limited to an "as applied" challenge.

### 1. The Nature of Plaintiffs' Constitutional Challenge

Ordinarily, a legislative Act may be challenged in two ways: (a) by establishing that it is wholly, *i.e.* facially, unconstitutional or (b) by demonstrating that it is unconstitutional as applied in a particular way or as applied to a particular person or group.

#### a. *Facial Challenges*

■ The Supreme Court has held that "[a] facial challenge to a legislative Act is ... the most difficult challenge to mount successfully, since the challenger

must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *see also Cranley v. Nat'l Life Ins. Co.*, 318 F.3d 105, 110 (2d Cir.2003) (citing *Salerno* ). The fact that a legislative Act "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid .... " *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. "A plaintiff making a facial claim faces an 'uphill battle' because 'it is difficult to demonstrate that the mere enactment of a piece of legislation violates the plaintiff's constitutional rights." *Cranley*, 318 F.3d at 110 (quoting *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997)).

■ In the instant case, Plaintiffs cannot satisfy the *Salerno* standard with respect to their Indian rights claims. The reason for this is readily apparent: even if Plaintiffs establish that the Statute violates Indian rights, the law might still be constitutionally applied to non-Indians. Thus, a set of circumstances exists under which the Statute would be valid. Plaintiffs do not dispute this. Nevertheless, they assert that a facial challenge is appropriate because the *Salerno* standard is inapplicable to cases involving Indian rights.

Plaintiffs offer two principal arguments in support of this theory: (i) the Supreme Court has entertained a facial challenge based upon Indian rights without mentioning *Salerno* and (ii) applying *Salerno* to an Indian rights case would "read" those rights out of the Constitution. For the following reasons, this Court finds these arguments unpersuasive.

As far as this Court can determine, the Supreme Court has never expressly carved out an Indian rights exception to the *Salerno* standard.[6] It is true that the Supreme Court has entertained a facial challenge based upon Indian rights without mentioning the *Salerno* standard. *See Dep't of Taxation & Fin. of New York v. Milhelm Attea & Bros.*, 512 U.S. 61, 69, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994) ("[The plaintiffs'] challenge ... is essentially a facial one."). However, the *Attea* case involved a challenge to a regulatory scheme specifically related to Indians and Indian commerce. *Id.* at 64, 114 S.Ct. 2028. Because the challenged regulations were specifically designed to regulate commerce with Indians, and only commerce with Indians, every application of the regulations implicated Indian rights. If the regulations violated Indian rights, they would violate them every time they were applied. The Supreme Court was therefore not faced with a situation in which the challenged legislation could be applied in a manner that did not implicate Indian rights. As such, there was no issue in *Attea* regarding the plaintiffs' ability to make a facial challenge. Viewed in that context, the fact that the Supreme Court did not discuss the *Salerno* standard cannot be construed as implicitly endorsing or "carving out" an exception to the general rule. In sharp contrast to the situation

---

**6.** The only express exception to *Salerno* is the "overbreadth" doctrine applicable to First Amendment cases. *See Salerno*, 481 U.S. at 745, 107 S.Ct. 2095; *see also City of New York v. United States*, 179 F.3d 29, 33 (2d Cir.1999) (noting that the *Salerno* standard applies to facial challenges "outside the limited context of the First Amendment"). This Court is also mindful that a plurality of the Supreme Court has cast some doubt on the *Salerno* standard generally. *See City of Chicago v. Morales*, 527 U.S. 41, 55–56 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). Nevertheless, *Salerno* remains controlling authority in the Second Circuit. *See, e.g., Cranley*, 318 F.3d at 110; *Kittay v. Giuliani*, 252 F.3d 645, 647 (2d Cir. 2001).

presented in *Attea*, the present case involves a challenge to a state law that does not reference Indians, Indian tribes, or Indian reservations, and could be applied in a myriad of ways that would not implicate Indian rights.[7]

Second, Plaintiffs' argument that application of the *Salerno* standard to an Indian case would vitiate Indian rights is without merit. Under *Salerno*, Indians are able to seek redress for violations of their unique rights by facially challenging legislative Acts that relate specifically to Indians, so long as they can establish that the Act is unconstitutional in every application. Moreover, Indians retain the ability to assert their constitutional rights in "as applied" challenges to legislative Acts.

In sum, this Court finds that with respect to their Indian rights claims, Plaintiffs cannot sustain a facial challenge to the Statute because they have not established that "no set of circumstances exists under which the [Statute] would be valid." *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. The fact that the Statute might be unconstitutional if enforced against Indians is not sufficient to render it wholly, *i.e.* facially, invalid. *See id.* Therefore, with respect to their Indian rights claims, Plaintiffs are limited to challenging the Statute "as applied."

### b. *Ripeness of Plaintiffs' As Applied Challenge*

Before addressing the merits of Plaintiffs' "as applied" challenge, this Court must determine whether this matter is ripe for judicial determination. This is an issue because, to this point, the Statute has not been directly applied to Plaintiffs, *i.e.* they have not been prosecuted or fined for shipping or transporting cigarettes to New York consumers.

■ "[I]t is well settled that a litigant need not expose himself to criminal prosecution to challenge the constitutionality of a statute providing criminal penalties." *Gary D. Peake Excavating, Inc. v. Town Bd. of the Town of Hancock*, 93 F.3d 68, 72 (2d Cir.1996) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). In *Babbitt*, the Supreme Court explained that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." 442 U.S. at 298, 99 S.Ct. 2301 (citations omitted). "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecu-

---

**7.** Plaintiffs also cite *United States v. Thirty Eight Golden Eagles or Eagle Parts*, 649 F.Supp. 269 (D.Nev.1986). In that case, the federal government sought forfeiture of certain eagles and eagle parts seized pursuant to the Eagle Protection Act. *Id.* at 271. The claimant, an Indian, opposed the forfeiture on the grounds that the Eagle Protection Act and related regulations violated his rights under the Free Exercise Clause of the First Amendment, the American Indian Religious Freedom Act, and various Indian treaties. *Id.* Without discussing *Salerno*, the district court found that the claimant had standing to facially challenge the Act. *Id.* at 272–74.

However, *38 Eagles* is distinguishable from the present case because the Eagle Protection Act contained regulations applicable specifically to Indians. *Id.* at 272. In contrast, the Statute here does not reference Indians or Indian commerce and does not impose any special requirements on Indians. Moreover, the fact that the court never addressed the *Salerno* standard suggests that the specific issue currently faced by this Court was not presented to the court in that case. In any event, even assuming *arguendo* that *38 Eagles* posits an Indian rights exception to *Salerno*, this Court finds that non-binding precedent unpersuasive.

tion as the sole means of seeking relief.'" *Id.* (quoting *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)).

■ Plaintiffs wish to engage in a specific course of conduct covered by the Statute. They want to continue their cigarette sales activities, including the direct shipment of cigarettes to New York consumers and the use of common and contract carriers to transport cigarettes to consumers in New York. (Snyder Affidavit, ¶ 16–25; Ward Affidavit, ¶ 17–28). The Statute criminalizes those activities. *See* N.Y. PUB. HEALTH LAW §§ 1399–*ll* (1)—(2). Although Defendants submitted affidavits from state employees indicating that the State does not plan to enforce the Statute with respect to certain transactions involving Indians, (Sevenson Affidavit, ¶ 2; Stanton Affidavit, ¶ 5–6), this Court finds that Plaintiffs face a realistic danger of sustaining a direct injury as a result of the Statute's operation or enforcement. Nothing in the plain language of the Statute prevents the State from enforcing its provisions against Plaintiffs or those with whom they transact business (*e.g.*, carriers). There is no indication that the affidavits are legally binding or that the affiants have the authority to restrict the State's ability to enforce the Statute. Moreover, the affidavits only refer to the State's *current* plans, nothing in those documents would prevent the State from changing its position at any time in the future. Accordingly, this Court finds that this matter is ripe for judicial determination.

Having determined that Plaintiffs may challenge the Statute "as applied," this Court must now consider whether they have demonstrated a likelihood of success on the merits. As noted above, Plaintiffs argue that the Statute infringes upon their Indian rights in two ways: by regulating Indian commerce in violation of the Indian Commerce Clause and by interfering with tribal sovereignty.

**2. Indian Commerce Clause**

Article I, Section 8 of the Constitution grants Congress the power "[t]o regulate Commerce ... with the Indian Tribes ...." U.S. CONST. art. I, § 8, cl. 3. This is known as the Indian Commerce Clause. Plaintiffs contend that the Indian Commerce Clause has a "dormant" or negative aspect. They argue that by granting Congress the power to regulate Indian commerce, the clause implicitly forbids States from regulating such commerce. Accordingly, Plaintiffs claim that the Statute is unconstitutional because it is a state law that regulates the manner in which Indians engage in a particular form of commerce, namely the sale of cigarettes.

■ This Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that the Statute violates the Indian Commerce Clause. Although another provision of the Constitution, the Interstate Commerce Clause, has a dormant or negative aspect, the Indian Commerce Clause does not. In *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), the Supreme Court noted that it is "well established that the Interstate Commerce and Indian Commerce Clauses have very different applications." The Court explained that while the Interstate Commerce Clause has a dormant aspect "concerned with maintaining free trade among the States even in the absence of implementing federal legislation, ... the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." *Id.* (citations omitted). Moreover, the Interstate Commerce Clause "is premised on a structural understanding of the unique role of the States in our consti-

tutional system that is not readily imported to cases involving the Indian Commerce Clause." *Id.* The Court concluded that "the fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply [Interstate] Commerce Clause doctrine developed in the context of commerce 'among' States with mutually exclusive territorial jurisdiction to trade 'with' Indian tribes." *Id.*

Moreover, Plaintiffs' argument that the Indian Commerce Clause operates as a blanket prohibition on state laws that regulate Indian commerce is inconsistent with numerous Supreme Court decisions upholding such laws. *See, e.g., Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 154–62, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Attea,* 512 U.S. at 75, 114 S.Ct. 2028. These decisions are discussed more fully *infra* in Section III.B.3.

In sum, the Indian Commerce Clause, standing alone, does not automatically prohibit state regulation of Indian commerce. *See Colville,* 447 U.S. at 157, 100 S.Ct. 2069 ("It can no longer be seriously argued that the Indian Commerce Clause, of its own force, automatically bars all state taxation of matters significantly touching the political and economic interest of the [Indian] Tribes.") (citation omitted). However, the analysis does not end there. The clause "may have a more limited role to play in preventing undue discrimination against, or burdens on, Indian commerce." *Id.* In the present case, this Court finds that these concerns are not implicated. The Statute does not discriminate between Indian commerce and non-Indian commerce. Further, as discussed more fully *infra* in Section III.B.3, even though the Statute may effectively reduce tribal cigarette sales to non-members, it does not

unconstitutionally burden Indian commerce with non-Indians.

For the foregoing reasons, this Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that the Indian Commerce Clause, standing alone, renders the Statute unconstitutional.

### 3. Tribal Sovereignty

▉▉▉ The Supreme Court has long recognized that "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (quoting *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L.Ed. 25 (1831)). "Indian tribes are unique aggregations possessing 'attributes of sovereignty over both their members and their territory.'" *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 332, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)) (quoting *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)). The Court has said that "[b]ecause of their sovereign status, tribes and their reservation lands are insulated in some respects by an 'historic immunity from state and local control.'" *Mescalero,* 462 U.S. at 332, 103 S.Ct. 2378 (citation omitted). Further, "tribes retain any aspect of their historical sovereignty not 'inconsistent with the overriding interests of the National Government.'" *Id.* (quoting *Colville,* 447 U.S. at 153, 100 S.Ct. 2069).

▉▉▉ The principle of tribal sovereignty has "given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Bracker,* 448 U.S. at 142, 100 S.Ct. 2578. "First, the exercise of

[state regulatory] authority may be preempted by federal law." *Id.* (citations omitted). "Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'" *Id.* (quoting *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)).

■ At one time, the Supreme Court held that tribal sovereignty was absolute. *See Worcester v. Georgia,* 6 Pet. 515, 561, 8 L.Ed. 483 (1832) (holding that "the laws of [a State] can have no force" within reservation boundaries). However, the Court departed from that view "long ago." *Bracker,* 448 U.S. at 141, 100 S.Ct. 2578 (citations omitted). The Court's current position is that "the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation." *Nevada v. Hicks,* 533 U.S. 353, 361, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). In sum, a sovereign State's power "does not end at a reservation's border." *Id.*

■ When tribal sovereignty and state regulatory authority collide, courts must seek to "reconcile the plenary power of the States over residents within their borders with the semiautonomous status of Indians living on tribal reservations." *Attea,* 512 U.S. at 73, 114 S.Ct. 2028 (quoting *McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 165, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)). "Resolution of conflicts of this kind does not depend on 'rigid rules' or on 'mechanical or absolute conceptions of state or tribal sovereignty ....'" *Attea,* 512 U.S. at 73, 114 S.Ct. 2028 (quoting

*Bracker,* 448 U.S. at 142, 145, 100 S.Ct. 2578) (alteration in original). Rather, courts must undertake "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Attea,* 512 U.S. at 73, 114 S.Ct. 2028 (quoting *Bracker,* 448 U.S. at 145, 100 S.Ct. 2578).

The instant case presents a conflict between New York's regulatory authority and the sovereign status of Plaintiffs as Indians living on a tribal reservation located within New York's borders.[8] This Court must reconcile these interests by conducting the type of particularized inquiry outlined above.

■ As part of this inquiry, it is important to note that there is a "significant geographical component" to tribal sovereignty. *Bracker,* 448 U.S. at 151, 100 S.Ct. 2578. Although "the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits." *Id.* In addition, for purposes of this analysis, this Court must distinguish not simply between Indians and non-Indians, but rather between tribe members and non-tribe members.[9] *See Colville,* 447 U.S. at 160–61, 100 S.Ct. 2069 ("Federal statutes, even given the broadest possible reading to which they are reasonably susceptible, cannot be said to pre-empt [a State's] power to impose its taxes on Indians not members of the Tribe.").

---

**8.** It should be noted that although Plaintiffs are enrolled members of the Seneca Indian Nation, the Tribe is not a party to this action. However, Defendants have not cited and this Court cannot find any authority suggesting that tribal sovereignty claims are limited to cases in which an Indian tribe is a party.

**9.** For purposes of this decision, the term "tribe member" refers to an enrolled member of the Seneca Indian Nation, such as Plaintiffs.

 Based upon the current record, this Court finds that the Statute implicates tribal sovereignty in so far as it restricts or prohibits the following transactions:[10] (a) shipment or transportation of cigarettes by a tribe member from the reservation to a non-tribe member, (b) shipment or transportation of cigarettes by a tribe member from the reservation to another tribe member on the reservation, (c) shipment or transportation of cigarettes from an individual (who may or may not be a tribe member) located off of the reservation to a tribe member located on the reservation.[11]

In the context of the instant motion, this Court must determine whether Plaintiffs are likely to succeed on the merits of their claim that the Statute violates tribal sovereignty by restricting or prohibiting these types of transactions.

(a) *Shipment or Transportation by Tribe Member from the Reservation to Non–Tribe Member*

 Plaintiffs allege that mail order, telephone, and Internet cigarette sales occur "on" the reservation because that is where the transaction is consummated. This Court will assume that this is true for purposes of this decision. The issue then is whether New York may regulate the on-reservation sale of cigarettes by a tribe member to a non-tribe member. The Statute essentially limits those sales to face-to-face transactions at "brick and mortar" stores located on the reservation.

Defendants argue that Plaintiffs' claim is unlikely to succeed with respect to this category of transactions because of a line of Supreme Court precedents upholding the authority of States to regulate on-reservation transactions between tribe members and non-tribe members. *See, e.g., Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 483, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (holding that Montana could require Indian retailers on an Indian reservation to collect state taxes on sales to non-Indians); *Colville*, 447 U.S. at 154–62, 100 S.Ct. 2069 (finding that the State of Washington could impose cigarette and sales taxes with respect to on-reservation purchases by non-tribe members); *Citizen Band*, 498 U.S. at 512–14, 111 S.Ct. 905 (ruling that Oklahoma could collect taxes on goods sold to non-tribe members); *Attea*, 512 U.S. at 75, 114 S.Ct. 2028 (upholding New York regulatory scheme that imposed record-keeping requirements and quantity limitations on cigarette wholesalers who sell untaxed cigarettes to reservation Indians). For the sake of convenience, these decisions will be referred to as the "*Colville* cases."

In response, Plaintiffs contend that the *Colville* cases are limited to the area of state taxation. Further, they argue that

---

**10.** Each of the identified transactions involves some aspect of on-reservation commerce with a tribe member. Transactions occurring entirely off of the reservation do not implicate tribal sovereignty even if they involve a tribe member. *See Citizen Band*, 498 U.S. at 511, 111 S.Ct. 905 (noting that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State") (citation omitted). In addition, transactions that do not involve tribe members obviously do not implicate tribal sovereignty.

**11.** The Statute contains three exceptions that permit the shipment and transportation of cigarettes to certain entities, *e.g.*, a person licensed as a cigarette tax agent or wholesale dealer. For purposes of the instant discussion, the assumption is that the customer (or "receiver") of the cigarettes does not fall within any of those exceptions. It is also assumed for purposes of this analysis that the transaction does not involve the use of the "home delivery exception" contained in Subdivision Two.

those cases are distinguishable because the state regulations upheld by the Supreme Court placed only minimal burdens on Indian commerce. In contrast, Plaintiffs assert that the Statute here completely arrests Indian commerce. Plaintiffs contend that the Supreme Court decisions most analogous to the instant case are those in which the Court struck down state regulations pertaining to commerce between tribe members and non-tribe members, finding that those regulations were preempted by principles of tribal sovereignty. *See Mescalero*, 462 U.S. at 331–44, 103 S.Ct. 2378 (holding that New Mexico could not regulate hunting and fishing on the reservation); *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214–22, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (finding that California regulation of on-reservation gaming violated tribal sovereignty). For purposes of this decision, these cases will be referred to as the "*Mescalero* cases."

The parties' arguments present the following questions: Are the *Colville* cases limited to the area of state taxation? If not, is the present case closer to the *Mescalero* cases or the *Colville* cases in terms of the balance between the state, federal, and tribal interests? This Court will address both questions *seriatim.*

At this stage of the litigation, it appears to this Court that the *Colville* cases are not limited to the area of state taxation. In *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), a case that did not involve taxation, the Supreme Court relied upon two of the *Colville* cases.

In *Rice*, the plaintiff Indian trader challenged California's liquor license law, which required him to obtain a license to sell liquor for consumption off of the reservation. *Id.* at 715–16, 103 S.Ct. 3291. The Court upheld the law, holding *inter alia* that "[t]o the extent that [the Indian trader] seeks to sell to non-Indians, or to Indians who are not members of the tribe with jurisdiction over the reservation on which the sale occurred, the decisions of this Court have already foreclosed [his] argument that the licensing requirements infringe upon tribal sovereignty." *Id.* at 720, 103 S.Ct. 3291. The Court then cited *Moe* and *Colville*, explaining that "[r]egulation of sales to non-Indians or nonmembers of the . . . Tribe simply does not 'contravene the principle of tribal self-government,' and, therefore, neither [the trader] nor the . . . Tribe has any special interest that militates against state regulation in this case, providing that Congress has not pre-empted such regulation." *Rice*, 463 U.S. at 720 n. 7, 103 S.Ct. 3291 (citing *Moe*, 425 U.S. at 475–76, 96 S.Ct. 1634; *Colville*, 447 U.S. at 151, 161, 100 S.Ct. 2069).[12] Furthermore, in *Nevada v. Hicks*, another non-tax case, the Supreme Court noted that "[w]hen . . . state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land, as exemplified by our decision in [*Colville* ]." 533 U.S. at 362, 121 S.Ct. 2304.

The next issue is whether this case is closer to the *Mescalero* cases or the *Colville* cases in terms of the balance between the state, federal, and trial interests. For

---

**12.** Plaintiffs correctly note that the *Rice* ruling was based, in part, upon the existence of a federal statute, 18 U.S.C. § 1161, abrogating tribal immunity with respect to state liquor regulation. *See Rice*, 463 U.S. at 726–35, 103 S.Ct. 3291; *see also Cabazon*, 480 U.S. at 220, 107 S.Ct. 1083 (discussing *Rice* ). Plaintiffs argue that this fact renders *Rice* Inapplicable

to the present case. This argument is unpersuasive. The *Rice* Court held that the Indian trader's arguments regarding sales to non-tribe members were foreclosed by "the *decisions* of this Court," referring to *Colville* and *Moe* rather than to a particular federal statute. 463 U.S. at 720, 103 S.Ct. 3291 (emphasis added).

the following reasons, this Court finds that the *Colville* cases are more analogous to the present case.

In both of the *Mescalero* cases, the Supreme Court's decision to strike down the state regulation was based, in large part, upon the fact that the regulation interfered with a well-established federal policy approving and actively promoting tribal control over the particular activity. In *Mescalero,* the issue was whether New Mexico could regulate hunting and fishing on the reservation. 462 U.S. at 325, 103 S.Ct. 2378. The Supreme Court held that it could not, explaining that "this aspect of tribal sovereignty has been expressly confirmed by numerous federal statutes." *Id.* at 337–38, 103 S.Ct. 2378 (citing federal laws confirming power of tribes to regulate on-reservation hunting and fishing). Further, the Court found that "the exercise of concurrent state jurisdiction in this case would completely 'disturb and disarrange' ... the comprehensive scheme of federal and tribal management established pursuant to federal law." *Id.* at 338, 103 S.Ct. 2378 (citations omitted).

The *Cabazon Band* decision was based upon similar reasoning. In that case, the Supreme Court held that California could not apply its gambling ordinances to bingo and card games played on the reservation. *Cabazon Band,* 480 U.S. at 214–22, 107 S.Ct. 1083. In reaching this decision, the Court noted the existence of various federal "policies and actions, which demonstrate the [Federal] Government's approval and active promotion of tribal bingo enterprises ...." *Id.* at 218, 107 S.Ct. 1083. The Court outlined the various ways in which "the Department of the Interior, which has the primary responsibility for carrying out the Federal Government's trust obligations to Indian tribes, has sought to implement these policies by promoting tribal bingo enterprises." *Id.* at 217–18, 107 S.Ct. 1083

(summarizing various federal efforts to promote tribal bingo enterprises).

In the present case, Plaintiffs failed to cite and this Court could not find any evidence of a federal policy favoring or promoting tribal control over the sale of cigarettes or confirming the power of tribes to regulate such sales. In fact, the federal government has been generally supportive of *state* regulation of cigarette sales. For example, the Jenkins Act provides, *inter alia,* that any person who sells cigarettes in interstate commerce and ships those cigarettes into a state that taxes the sale or use of cigarettes must file a monthly report with the state tax administrator specifying the name and address of the person to whom the shipment was made, the brand of the cigarettes, and the quantity purchased. 15 U.S.C. § 375, *et. seq.* In addition, under the "Synar Amendment," states may not receive certain federal aid unless they enact a law banning the sale of tobacco products to minors, effectively enforce such a law, and conduct random, unannounced compliance checks to ensure that retailers are not selling tobacco to minors. 42 U.S.C. § 300x–26.

Another important distinction between the present case and the *Mescalero* cases pertains to the state interest implicated by the proposed regulation. In *Mescalero,* the Court noted that "[a] State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention." 462 U.S. at 336, 103 S.Ct. 2378. In that case, the Court struck down the state regulation of on-reservation hunting and fishing, noting that New Mexico was unable to "point to any off-reservation effects that warrant State intervention." *Id.* at 342, 103 S.Ct. 2378. In *Cabazon Band,* the Court found that California's asserted interest in regulating tribal bingo

(preventing the infiltration of the games by organized crime) was legitimate, but not sufficiently serious to override the countervailing federal and tribal interests. 480 U.S. at 220–21, 107 S.Ct. 1083.

In contrast, New York State has a powerful interest in regulating the sale of cigarettes. It is well-established that the "regulation of the importation and sale of cigarettes ... [is] a legitimate exercise of state power in the public interest ...." *Brown & Williamson*, 320 F.3d at 216–17 (internal citation omitted). Moreover, the Statute is designed to counteract "the pernicious effects of cigarette smoking" by reducing adult consumption and restricting minors' access to cigarettes. *Id.* at 217. The Statute is supported by the following legislative findings: "that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to the public health, safety, and welfare, to the funding of health care ..., and to the economy of the state." N.Y. PUB. HEALTH LAW, ch. 262, § 1. The legislature was specially concerned about underage smoking. *See* N.Y. PUB. HEALTH LAW, ch. 262, § 1 ("The legislature also finds that when cigarettes are shipped directly to a consumer, adequate proof that the purchaser is of legal age cannot be obtained by the vendor, which enables minors to avoid the provisions of article 13–F of the public health law."). In addition, the legislature found that "by preventing the shipment of cigarettes directly to consumers, the State will be better able to measure and monitor cigarette consumption and to better determine the public health and fiscal consequences of smoking." N.Y. PUB. HEALTH LAW, ch. 262, § 1.

The final issue is the extent to which the Statute burdens tribal interests.

There is no dispute that Plaintiffs have some interest in tribal commerce with non-tribe members. It is further undisputed that States may impose at least "minimal burdens" on tribal commerce with non-tribe members to further legitimate laws and regulations. *See, e.g., Attea,* 512 U.S. at 73, 114 S.Ct. 2028; *Citizen Band,* 498 U.S. at 512–13, 111 S.Ct. 905. However, Plaintiffs contend that the Statute unduly burdens tribal commerce. In fact, they argue that the Statute completely destroys the business of reservation cigarette retailers.

Based upon the current record, this Court finds that this argument is unlikely to succeed. The Statute does not ban the sale of cigarettes. It restricts the direct shipment and transportation of cigarettes to New York consumers. Accordingly, the Statute has no impact on the ability of reservation retailers to sell cigarettes at their "brick and mortar" stores.[13] (As previously noted, Plaintiffs each own and operate such stores). Further, reservation retailers are free to sell, ship, or transport cigarettes to customers located outside of New York State. To the extent that the Statute burdens tribal commerce with non-tribe members located in New York, that burden appears to fall primarily on non-tribe members, rather than on the reservation retailers. This is because New York consumers who want to buy cigarettes from reservation retailers must now travel onto the reservation, whereas previously they could have the cigarettes shipped directly to their homes.

It is, of course, possible that by placing this burden on New York consumers, the practical effect of the Statute will be to reduce cigarette sales by reservation retailers to non-tribe members. However,

---

**13.** The term "reservation retailers" refers to enrolled tribe members, such as Plaintiffs, who own and operate retail sales businesses located on the reservation.

that effect would not necessarily render the Statute unconstitutional. *See Colville,* 447 U.S. at 151, 100 S.Ct. 2069 (noting that state taxation of sales to non-Indian customers by reservation retailers "may be valid even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians").

In sum, this Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that the Statute is unconstitutional as applied to the shipment and transportation of cigarettes by tribe members located on the reservation to non-tribe members. There does not appear to be any federal policy approving or promoting cigarettes sales by Indians. Indeed, the federal government seems decidedly in favor of state regulation of such sales. The state interest is particularly significant in this case because New York can point to off-reservation effects that necessitate state intervention. The Statute restricts, but does not completely eliminate, tribal commerce with non-tribe members. To the extent that the Statute burdens tribal commerce with non-tribe members located in New York, that burden falls primarily on the non-tribe members.

(b) *Shipment or Transportation of Cigarettes by Tribe Member from the Reservation to Another Tribe Member on the Reservation*

 A different question is presented with respect to transactions between tribe members on the reservation. It is well-settled that "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *Hicks,* 533 U.S. at 362, 121 S.Ct. 2304 (quoting *Bracker,* 448 U.S. at 144, 100 S.Ct. 2578).

As previously discussed, the Supreme Court has generally upheld state regulation of on-reservation commerce between tribe members and non-tribe members. *See, e.g. Colville,* 447 U.S. at 150–59, 100 S.Ct. 2069; *Moe,* 425 U.S. at 481–83, 96 S.Ct. 1634. However, the Court has been reluctant to allow state regulation of on-reservation commerce between tribe members. *See Moe,* 425 U.S. at 475–79, 96 S.Ct. 1634 (holding that Montana could not collect cigarette sales taxes with respect to on-reservation sales by tribe members to tribe members); *cf. also Colville,* 447 U.S. at 162–64, 100 S.Ct. 2069 (ruling that Washington's motor vehicle tax could not be imposed on vehicles owned by tribe members *inter alia* because tax was not "tailored ... to the amount of actual off-reservation use ...").

Defendants concede that the regulation of on-reservation activities between tribe members is subject to heightened scrutiny. (Defendants' Memorandum of Law in Opposition, p. 13). However, rather than attempting to show that the Statute survives this scrutiny, Defendants simply assert that there is no case or controversy here because the State does not plan to enforce the Statute with respect to these types of transactions. For the reasons discussed *supra* in Section III.B.1.b, this Court finds that Defendants' assurances are insufficient and that this matter is therefore ripe for judicial determination.

The Statute is designed to regulate the manner in which New York consumers purchase cigarettes. Specifically, it is intended to ensure that "they purchase cigarettes in a manner that allows the seller to verify the buyer's age and to collect the state excise tax." *Brown & Williamson,* 320 F.3d at 214. Based upon the current record, it does not appear that those interests are implicated by on-reservation transactions between tribe members.

Further, to the extent that it regulates on-reservation transactions between tribe members, the Statute is not tailored to account for actual off-reservation effects.

The general presumption is that state law is inapplicable to on-reservation conduct involving only tribe members. *Hicks*, 533 U.S. at 362, 121 S.Ct. 2304. At this stage of the litigation, it does not appear that Defendants are able to overcome that presumption. As such, this Court finds that Plaintiffs are likely to succeed on the merits of their claim that the Statute is unconstitutional insofar as it restricts the shipment or transportation of cigarettes from a tribe member on the reservation to another tribe member on the reservation.

(c) *Shipment or Transportation of Cigarettes from an Individual Located off of the Reservation to a Tribe Member Located on the Reservation*

■ The principal issue here relates to the reservation retailers' ability to acquire cigarettes from wholesalers. Under the Statute, wholesalers cannot ship cigarettes to reservation retailers because those retailers are located in New York State, but are not authorized "receivers" under the Statute.[14] For the same reason, common and contract carriers cannot transport wholesale shipments of cigarettes to reservation retailers.

At this stage of the case, it appears to this Court that the interests underpinning the Statute are not implicated by these types of transactions. As previously discussed, although the Statute directly regulates the shipment and transportation of cigarettes, it is clearly aimed at restricting the manner in which New York consumers purchase cigarettes. As such, when applied to the shipment or transportation of cigarettes to a tribe member located on the reservation, the issue is whether New York may regulate the manner in which tribe members on the reservation acquire cigarettes. At this stage of the litigation, it does not appear that the Statute implicates a state interest sufficient to justify that level of interference with tribal sovereignty. This is principally because the State has not identified the specific off-reservation effects implicated by these types of transactions.

As before, Defendants do not argue this issue on the merits. Rather, they suggest that there is no case or controversy because the New York State Department of Taxation and Finance recently advised the Seneca Indian Nation that "the current policy of the Department for enforcing the Statute will have no effect on shipments of cigarettes by wholesalers to recognized Indian Nations of Tribes or Indian-run businesses on Seneca reservations lands." (Stanton Declaration, ¶ 5). As discussed above in Section III.B.1.b, this assurance regarding Defendants' "current policy" is not sufficient and this Court finds that this matter is ripe for judicial determination.

In sum, this Court finds that Plaintiffs are likely to succeed on the merits of their claim that the Statute unconstitutionally restricts the shipment and transportation of cigarettes from individuals located off of the reservation to tribe members located on the reservation.

## C. FAAAA Preemption Claim

Subdivision Two of the Statute regulates the transportation of cigarettes, including

---

**14.** Subdivision One of the Statute designates the following individuals as authorized "receivers" of cigarette shipments: a person licensed as a cigarette tax agent or wholesale dealer under New York law, an export warehouse proprietor under federal law, or a state or federal official acting in his or her official capacity. N.Y. PUB. HEALTH LAW § 1399–*ll* (1).

the transportation of cigarettes by common and contract carriers. Plaintiffs contend that the Statute is preempted by the FAAAA, which limits the power of states to enact laws and regulations that affect the prices, routes, or services of carriers.

■ The Supremacy Clause of the Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Consequently, "state and local laws are preempted where they conflict with the dictates of federal law and must yield to those dictates." *Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 771 (2d Cir.1999) (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210–11, 6 L.Ed. 23 (1824); *Nat'l Helicopter Corp. v. City of New York*, 137 F.3d 81, 88 (2d Cir.1998)).

■ Federal preemption "may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Ace Auto*, 171 F.3d at 771 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)). When a federal statute expressly preempts state or local law, "analysis of the scope of the pre-emption statute must begin with its text." *Ace Auto*, 171 F.3d at 771 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). In addition, courts must also "start with the assumption that the historic police powers of the States [are] not to be superseded ... unless that was the clear and manifest purpose of Congress." *Ace Auto*, 171 F.3d at 771 (quoting *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240). The purpose of Congress is the "ultimate touchstone" of preemption analysis. *Id.* (citations omitted).

### 1. Congressional Purpose

The FAAAA, enacted by Congress in 1994, is a federal statute that expressly preempts state and local laws. Specifically, the FAAAA provides that a state "may not enact or enforce a law ... related to a price, route, or service of any motor carrier ... with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

As is evident, the language of the FAAAA's preemption provision is extremely broad. Conceivably, it could be read to prohibit almost any state regulation. (For example, state speed limits are, in a literal sense, "related to" the prices, routes, or services of carriers.) Courts must therefore avoid reading the phrase too literally. *See California Div. of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 335 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (Scalia, J. concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.")

It is therefore necessary to determine more specifically what Congress meant when it used those terms. Courts faced with this task have looked to the legislative history of the FAAAA, as well as to the interpretation of similar language in other federal statutes.

The Second Circuit reviewed the FAAAA's legislative history in *Ace Auto*, 171 F.3d at 776. The court found that "the reports issued in connection with § 14501 suggest that its purpose was to eliminate local economic regulation, not local safety regulation." *Id.* (citing FAAAA legislative reports). Specifically, the Second Circuit noted that "the legislative history indicates that state safety regulatory

authority ... was to be 'unaffected' by the preemption statute." *Id.* at 775.

The FAAAA's legislative history was also reviewed by the Ninth Circuit in *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1187–88 (9th Cir.1998). In that case, the court found that Congress enacted the FAAAA to address "two major problems facing interstate commerce." *Id.* at 1187. "Congress believed that across-the-board deregulation was in the public interest as well as necessary to eliminate non-uniform state regulations of motor carriers which had caused 'significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology, and curtail[ed] the expansion of markets.'" *Id.* (quoting FAAAA legislative reports). Additionally, "by enacting a preemption provision identical to an existing provision deregulating air carriers (the Airline Deregulation Act ('ADA')), Congress sought to 'even the playing field' between air carriers and motor carriers." *Id.* (citing FAAAA legislative reports).

In *Ace Auto* and *Mendonca*, the courts also referred to Supreme Court decisions interpreting the scope of preemption clauses in the ADA and the Employee Retirement Income Security Act ("ERISA"), which contain "related to" language similar to that found in the FAAAA. *See Ace Auto*, 171 F.3d at 773; *Mendonca*, 152 F.3d at 1188–89.

For example, in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385–86, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Supreme Court, interpreting the ADA's preemption provision, held that a state law may "relate to" the rates, routes, or services of an air carrier even if the law has only indirect effects on those matters. However, the Court noted that state action will generally not be preempted if it affects air carriers in "too tenuous, remote, or

peripheral a manner." *Id.* at 390, 112 S.Ct. 2031. In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the Court held that traditional state regulations that indirectly effect ERISA plans were not "related to" such plans under ERISA's preemption provision. Additionally, in *California Div. of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, the Supreme Court held that ERISA's preemption provision was not intended to preempt "a state law in an area of traditional state regulation based on [a] tenuous ... relation" to ERISA plans. 519 U.S. at 334, 117 S.Ct. 832.

### 2. FAAAA & the Statute

 As discussed *supra* in Section III.B.3, the Statute is a public health law enacted pursuant to New York's historic police power. *See Brown & Williamson*, 320 F.3d at 216–17. This Court therefore begins with a presumption against preemption. *See Ace Auto*, 171 F.3d at 771. As such, the question presented is whether it was the clear and manifest purpose of Congress to preempt this type of state regulation. *Id.* That is, whether enforcement of the Statute would interfere with or undermine the purposes of the FAAAA. For the following reasons, this Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that they have overcome the presumption against preemption in this particular case.

 The FAAAA's preemption provision was designed to override state economic regulation of interstate carriers. *Ace Auto*, 171 F.3d at 776. In the present case, the Statute is manifestly not an attempt by the State to impose economic regulations on carriers. Rather, the Statute is designed to combat the "the pernicious effects of cigarette smoking" by re-

ducing adult consumption and restricting minors' access to cigarettes. *Brown & Williamson*, 320 F.3d at 217. Indeed, the Statute is not even limited to carriers. It also restricts the ability of "any other person" to knowingly transport cigarettes. N.Y. PUB. HEALTH LAW § 1399–*ll* (2). In this regard, the Statute is like numerous other New York State laws that prohibit the knowing transportation and distribution of regulated items. *See, e.g.,* N.Y. ARIG & MARKETS LAW § 96–h (prohibiting "knowing . . . transportation at any and all places within the state of the fur, hair, skin, or flesh of domesticated dog . . . or . . . cat . . . as food [or] meat"); N.Y. ALCO. BEV. CONT. LAW. § 152 ("[a]ny person who shall . . . transport any illicit alcoholic beverage with intent to barter or exchange with, or to sell or give another the same or any part thereof is guilty of a misdemeanor"); N.Y. ENVT'L CONSERV. LAW § 11–0507(4) ("[n]o person shall . . . intentionally possess or transport zebra mussels except under a license or permit"). These types of laws and regulations "relate to" the business of carriers, but are not preempted by the FAAAA because Congress intended "to leave the states' residual control over safety and other local concerns intact . . . ." *Ace Auto*, 171 F.3d at 774.

The fact that the Statute is a public health law of general application distinguishes the instant case from *United Parcel Service, Inc. v. Flores–Galarza*, 318 F.3d 323 (1st Cir.2003), a case relied upon by Plaintiffs. *Flores–Galarza* involved a challenge to Puerto Rico's statutory scheme governing deliveries by interstate air carriers. *Id.* at 325. Under that scheme, an interstate air carrier could not delivery any package "unless the carrier first provide[d] proof that the package's addressee had paid the appropriate excise tax, or the carrier prepays the amount of the tax on the addressee's behalf." *Id.*

The First Circuit found that the scheme was preempted by the FAAAA. *Id.* at 332. As is apparent, *Flores–Galarza* involved state economic regulation related specifically to carriers. This is a critical distinction because the FAAAA's "primary purpose was to eliminate local economic regulation, not local safety regulation." *Ace Auto,* 171 F.3d at 776.

Plaintiffs also assert that the Statute is preempted because it imposes special burdens on carriers. In support of this argument, they point to the second sentence of Subdivision Two, which applies only to common and contract carriers. That sentence provides as follows: "if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in paragraph (a), (b) or (c) of subdivision one of this section." N.Y. PUB. HEALTH LAW § 1399–*ll* (2). For the sake of convenience, this provision will be referred to as the "home delivery presumption." Plaintiffs contend that the home delivery presumption requires carriers to open any package scheduled for home delivery to ensure that the package does not contain cigarettes. However, this contention is inconsistent with a reading of the Statute as a whole.

The home delivery presumption refers to the status of the person receiving the cigarettes, not to the contents to the package. The presumption is a part of Subdivision Two, which regulates the *knowing* transportation of cigarettes. Because Subdivision Two only applies to persons who "knowingly" transport cigarettes, transporters cannot violate the Statute unless they know that they are transporting cigarettes. This knowledge requirement applies to any transporter, including common and contract carriers. The home delivery presumption simply creates a presumption that a carrier would know that a

person living in a home or residence is not an authorized "receiver" under the Statute. The presumption would only apply when a carrier delivered a package, knowing that it contained cigarettes, to a home or residence. Nothing in the plain language of the Statute requires carriers to open packages and verify the contents.

In sum, the Statute is concerned with public health and safety, areas in which the States have traditionally regulated. The FAAAA's preemption provision was designed to override state economic regulations of carriers and further the Congressional goal of deregulation, while leaving intact local regulations concerning public safety. As such, this Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that the Statute is preempted by the FAAAA.

## IV. CONCLUSION

For the foregoing reasons, this Court finds that Plaintiffs are unlikely to succeed on the merits of their claim that the Statute violates the Indian Commerce Clause. In addition, Plaintiffs are unlikely to succeed with respect to their claim that the Statute infringes upon tribal sovereignty by regulating the shipment and transportation of cigarettes by tribe members to non-tribe members. Plaintiffs are also unlikely to establish that the Statute is preempted by the FAAAA.

However, this Court finds that Plaintiffs are likely to succeed on the merits of their claim that the Statute unconstitutionally restricts the shipment and transportation of cigarettes from one tribe member to another tribe member on the reservation. Additionally, Plaintiffs are likely to succeed on the merits of their claim that the Statute violates tribal sovereignty by regulating the shipment and transportation of cigarettes by individuals located off of the reservation to tribe members located on

the reservation. Therefore, this Court will temporarily enjoin the State from enforcing the Statute with respect to those types of transactions.

Lastly, this Court finds that Plaintiffs are not required to post a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure because this case advances an important public interest. *See Cosgrove v. Bd. of Educ. of the Niskayuna Central Sch. Dist.,* 175 F.Supp.2d 375, 398 (N.D.N.Y.2001) (citing *Pharmaceutical Soc'y of New York, Inc. v. New York State Dep't of Soc. Servs.,* 50 F.3d 1168, 1174–75 (2d Cir.1995)). Further, with respect to the particular transactions being enjoined by this Court, Defendants "have not shown that they will likely suffer harm absent the posting of a bond." *Cosgrove,* 175 F.Supp.2d at 399 (quoting *Doctor's Associates v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996)).

## V. ORDERS

IT HEREBY IS ORDERED that Plaintiffs' Motion for a Temporary Restraining Order (Docket No. 2) is GRANTED in part and DENIED in part.

FURTHER, that Defendants are enjoined from enforcing § 1399–*ll* of the New York Public Health Law with respect to the shipment and transportation of cigarettes by Plaintiffs from the Cattaraugus Indian Reservation to enrolled members of the Seneca Indian Nation located on the Cattaraugus Indian Reservation.

FURTHER, that Defendants are enjoined from enforcing § 1399–*ll* of the New York Public Health Law with respect to the shipment and transportation of cigarettes by any individual or business entity to the Cattaraugus Indian Reservation for receipt by Plaintiffs.

FURTHER, that pursuant to Rule 65(b) of the Federal Rules of Civil Procedure,

this order shall expire within ten (10) days of its entry on the official docket of this case, unless otherwise extended by subsequent order of this Court.

FURTHER, that this Court finds that Plaintiffs are not required to post a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

FURTHER, that counsel for the parties shall appear before this Court on Tuesday, August 26, 2003, at 12:00 p.m. in Part IV, United States Courthouse, 68 Court Street, Buffalo, New York for a status conference regarding Plaintiffs' Motion for a Preliminary Injunction.

SO ORDERED.